The 4th District of Illinois is now convened. The Honorable Peter T. Sheldon will preside. Thank you. Please be seated. First calling 4-220800 Thomas E. Aislett, appellant, Brett J. Cahill, appellees. Counsel to the appellant, please state your name for the record. Yes, J. Jansen. Thank you. And for the appellee? Good afternoon, Your Honor. Tom Wilson on behalf of Emory. Good afternoon. Good afternoon. Thank you. Counsel, you may proceed. Your Honors, may it please the Court. I think in any appellate review, one has to start first with the legal framework in which you adjudicate a case on review. And I believe almost all of the issues, and maybe all the issues, that are raised in this case are de nobis. This Court is going to use that standard of review in looking over each of the issues that we raise in our brief and in our argument. We have a situation with an ultra-hazardous product. We have a mass casualty event. And we feel there's just a record full of reversible error. Tom Aislett never had a chance. This case was decided before the jury was sworn. Evidence was taken out wrongfully. The jury never heard the real evidence. They never even heard the standard of care that was necessary to evaluate the case. And we tried the case for this Court. There's probably as much testimony that was taken and given by witnesses, confident witnesses, in an offer of proof as there was in actual testimony before the jury. The jury didn't hear huge volumes of evidence in this case, but they were presented in offers of proof on behalf of Tom. Let's talk about the fact that much of the evidence was eliminated by what I would call either motions in limine, which really were so broad and so drastic that they were really summary judgment motions. They were summary judgment decisions. Let's talk about the cable company first. They have a job involving ultra-hazardous. The ultra-hazardous job is running underground fiber optic cable in the city of Canton, Illinois. 17,000 people in the heart of Canton, Illinois, in the center of the town. And they're running the cable underground. All right. What's underground? Well, you don't know what's underground, but there are some markings that are made. And to run that cable underground, they use a Vermeer trencher. And it bores under the ground, and they can determine the height and depth of the excavation. It's really not an excavation. It's really a tunnel underground. Now, what happens here is that the cable company hires, and this is all oral. Is this hide the ball, or is it you have a job that's going to take over a year. It's going to involve hundreds of thousands of dollars. And according to the cable company and the man that owned the Vermeer trencher, they just had some kind of oral agreement. How much was to be paid? When it was to be paid, the cable company had a man out on the job all the time. The job couldn't start. The job had to stop as soon as he left. He inspected the work, and he measured how far the Vermeer trenching machine progressed to connect to a cable box. The Vermeer trencher man didn't know where the cable box was. The cable company man came, and he would show them where they had to connect the cable box to a subscriber. Mr. Jansen, I want to interrupt you here. I want to assure you that the three of us are very familiar with the facts. I don't want you to run out of time. You have a lot of issues in this appeal. Thank you. This is more for your benefit. All right. So he would measure the distance, and they would compute the payment that way. All right. What happened? As Your Honor read, they didn't pothole. Okay? They didn't pothole. That was a standard. That was violated. They go into a junket box. What's a junket box mean? Junket box means there's other utilities there. So you're underground. You're going to have migration if you cut a gas line. Sure enough, they cut a gas line, and as a result, you have 100 buildings either damaged or destroyed. One man killed. Others injured. So there's no contract. There was supervision. It's an inherently dangerous job. It's on public property. And therefore, the verdict against Cahill and Shershot on liability is automatic against the cable company under the law. Excuse me. Excuse me. In the post-trial motion, was that specific issue raised, the inconsistency of the verdict against Shershot and Cahill with the verdict in favor of mid-century? Was that raised in the post-trial motion? Oh, yes. Yes, specifically. Yes, ma'am. Inconsistent verdict. If you find Cahill and Shershot liable, you've got to find the cable company liable. That's basically the law. All right. Let's then move over to some of this excluded evidence. And this applies both to the cable company as well as the hammer. I think one of the most egregious denial of evidence was you start out every case basically using the public. The police officers, the fire department, their testimony. All right? This case, there was an extensive police investigation, fire investigation, and the reports were made by both the police and the fire department. As Ray starts the trial, and I had an attorney who would project this. He says, Judge isn't going to allow the police officer to testify. And I just flabbergasted. I have four attorneys against me. And I then put on the trenching man that operated the trenching machine because I had him available in the hallway along with the police officers and the fire department, thinking I'll get this straightened out. Well, I couldn't get it straightened out. I had the trenching man basically admitting liability. And then I put on, I'll offer proof, the fire department and the police department. The judge said, and it's really easy, the judge said I couldn't put these policemen, fire department people, because it's cumulative. Cumulative of what? I hadn't even put on a witness yet. And then the attorney for the cable company said, we didn't get the police report and the fire department report. That was exhibit one in Ameren's disclosure. We disclosed it. And if you look at the appendix from the cable company, you'll find that the city of Canton also disclosed the fire department reports and the police department reports. Well, what did these reveal? It revealed the whole basic background of this case to say they didn't have these things. I went before the judge. I said, judge, I said, put these lawyers under oath that they don't have these things. Mr. Wilson produced them as exhibit one in his list of examinees. We produced them and their names and that they were police officers, that they investigated the incident. And we said they testify consistent with the reports. Same thing that the city did. All right. Counsel, just pushing ahead a little bit, what's the error in not allowing the testimony and what's the relevance of the testimony? Relevant question. Yes, sir, Your Honor. All right. What would they testify to that the jury didn't hear? The jury never heard any real liability testimony. They would have heard from the investigator detective. And this is in an offer of proof. They would have heard that the detective interviewed Candy Arnold, Jim Gromer, chief executive officer for Mid-Century Communications. Gromer relayed the following information and indicated that Mid-Century had been varying cable throughout the city of camp for some time. Mid-Century inspector, Joseph Yelm, was overseeing the work being completed on November 17, 2016, by a contract company, SureShot Communication. Gromer said, it's a typical practice to have an inspector on site to monitor the contract company who is drilling. Gromer was informed, SureShot, and then he goes on to explain that they heard the hissing and what happened. Well, you've got the whole supervision. The jury never heard any of that, never heard any of this. Then, let's move over to the fire department. What did they come up with? Well, Mr. Jansen, the police and fire personnel that were disclosed, they were disclosed as 213F1 witnesses. Yes. Okay. I read in one of Athlee's briefs that there were 191 witnesses disclosed. Is that accurate? Every public officer, there were. Okay. They were broken down in sections. Canton Fire Department, Canton Police Department testified consistent with their reports, and they had the reports. Hold on. The reports weren't attached to the answers to the 213 interrogatories. Is that accurate? No. That's not accurate? No, no. Exhibit number one. No. I'm sorry. I may not have made myself clear. Is it correct that the reports were not attached to the answers for the 213 interrogatories? I understand the answer that they were, the reports were, and the reports were circulated way early in this case, and it was in number one exhibit of Ameren with the reports. I mean, everybody had these reports. There wasn't any question about it. You started the case off with these reports. It would be like a police report. I mean, I watched it. Did you depose? Did you depose any of these people that you? I didn't. Okay. See, I don't generally depose everybody. I'm trying to save a little money to make a case, you know. I knew what these people had testified to. Presumably, defendants were in the same position, and if they get a list of 191 names, I mean, what would you do if you got 191 notices of deposition? What would you have said? You would have gone to the trial court for relief, right? Well, they didn't do that. No. I'm saying what is. You would have asked them to specify who they, why they wanted to depose those people. Well, isn't that the function of 213F is to identify in some more particular way than just putting a name down what the testimony is going to be? I mean, ever since 213 came about and case law has examined it, it's kind of laid out minimum standards for what an answer should look like. And I'm just asking you, why is it that the names here alone were specific and then a reference made to their reports? Are there any cases that say that that would be appropriate? Perhaps you should ask Mr. Wilson, who did, I believe, attach the reports as Exhibit 1 and discovered it. Well, the 24th counsel for the cable company is saying, well, I did get some reports, but they didn't read it. He said that. I didn't get some, but I didn't read it. Is that justification for keeping all this evidence out? Did it concern you as you were preparing for trial that these witnesses that you were going to call us, witnesses at trial, hadn't yet been deposed? It looks like maybe they were just kind of lying in wait for this. I think the defense basically thought this is a walk-in case, that the plaintiff would win the case probably, and they eliminated the testimony, all the liability testimony. They've eliminated the standards, Your Honor. Take the standards. These are federal gas operating standards. Federal, state, local. Ameren's own standards. What do you do when you have an underground leak? What do you do? You evacuate. Number one, evacuate. What's Ameren saying? Oh, you have to use discretion. It's a drill to protect the public. First thing you do is evacuate. Now it's underground. There are different standards. Once it's underground, you've got migration, no doubt. Evacuate number one. May I ask you something about that? You say if it's underground, you're going to have migration. Is that a fact? Was that a fact that was testified to at trial? Well, how did the drill bit cut the line? You've got a hole under the ground. Where's the gas going to go? After the fact, when there was an explosion, then it was determined that gas had migrated down the borehole. But in real time, was there evidence that there had been migration? Didn't witnesses go around with meters to try to determine if there had been? But they're out in the air at the foundation of a building. It migrated underneath. They had a coal chute, an old coal chute. It went through there. No one knew what's underground. That's why you have to pothole. That's why you can't have this problem. It's ultra-hazardous. It created a mass store. When you're underground, it's dangerous, Your Honor. And Ameren knew it, and so did the cable company. I don't want to represent this as fact. Correct me if I'm wrong. But in terms of the Ameren rules or guidelines, the use of the shutoff valves, that would be if there was an indication of migration. Is that right? No. You shut off valves. You don't do that first. See, that's a mistake the men made. And it's not their fault. They weren't trained. If you've got an underground leak, the first thing you do is evacuate. Federal rules, state rules, operating gas manual rules, evacuate. They didn't do it. Okay? That's liability right there. Approximate cause, you don't put out. Second of all, you turn off valves. Why didn't they turn off the valves? What's the evidence on this? Well, four years before this horrible catastrophe, and we brought all this up, not the National Safety Transportation Board, not any other investigator. We took tens of thousands of pages of documentation. Four years before, they, Aaron, relocated all the distribution lines, and they increased the pressure of the gas from one-half pound per square inch to 30-plus pounds per square inch, and the Congress Commission gave them the right to do 60 pounds through a plastic line. Okay? And as a result, you have a breach in that line. Where's that gas going to go? It's going to go anywhere that it can get out. Now, some of it came out straight up, and it blew rocks and it blew dust and dirt and everything else, 30 pounds plus. Mr. Jansen, you are out of time. You will have time in rebuttal. I want to save the time for rebuttal. Yes, you will. You're out of time now. You'll have time in rebuttal. Thank you. All right. Thank you. For the appellee, Mr. Wilson, I believe you have the first 10 minutes. Yes, Your Honor. Thank you. May it please the Court, Tom Wilson on behalf of Amarillo, Illinois. Mr. Jansen, I really just want to make a few points this afternoon. I know this case has been very thoroughly briefed. The first point I want to make is the appreciation we have for the management that Judge Ewing had of the case. He had 19 consolidated cases, and I think the record demonstrates the incredible judgment and discretion he used throughout this case, which is the only one that went to trial, and quite frankly, the patience that he demonstrated in multiple hearings on these issues and allowing the plaintiff repeated opportunities to take additional discovery. In that regard, you mentioned the word discretion. Here, in terms of the exclusion of witnesses, we are looking at this from the standpoint of an abuse of discretion. Yes. Just following up on Mr. Jansen's point in regards to the fire and police personnel, them being excluded, again, this was a discretionary ruling on the part of the trial judge here, but it is somewhat unusual that in advance or at trial, witnesses of that sort would be excluded from testifying based on a 213 violation when reference is made to an accident report. So can you just tell me specifically or tell us specifically why, when reference has been made to a report that is in your possession, why that shouldn't be sufficient disclosure? Yes, absolutely. And keep in mind, Your Honor, when Judge Ewing made the decision as far as exclusion of these police and fire witnesses, he didn't base it just on the failure to properly comply with 213. He allowed the plaintiff to call these witnesses for an offer of proof, to listen to what Mr. Jansen wanted to ask them in front of the jury, to determine if it was relevant and if it would simply be cumulative of other evidence in the case. And Judge Ewing made it very clear that the case that was on trial was that of Dr. Eizelt and what happened to him. Obviously, there was a large explosion in downtown Canton. There were hundreds of people who could have been called to testify to that fact, and several witnesses obviously did, and there were multiple photographs introduced to show the damage to this section of downtown Canton. And let's just take for an example Tony Plummer, who was the assistant fire chief. He was one of these witnesses. When Chief Plummer was called for his offer of proof, we asked him questions. Well, did you investigate what happened? No, I didn't. I was just a responder. I did no investigation. Do you have any opinions about what caused the explosion, what the source of ignition was? No, I don't. Do you have any opinion when you say you heard gas still leaking after the explosion, keeping in mind the magnitude of the explosion and that it knocked several gas meters on adjoining buildings off their foundation? He said, no, I don't know where it was leaking from. So in that case, we then asked Chief Plummer, well, did you have any contact with Dr. Eizelt? Do you have anything to add as to what it was that happened to Dr. Eizelt? No, I never met the man. So when Judge Ewing made the decision in this case as to what he would admit or exclude, it wasn't just a discovery issue, it was also a relevance issue. Does that answer your question? Well, it does potentially as to a single witness, but I'm talking generally in regards to a class of witnesses, fire personnel and police personnel, who have authored reports, and the reports are in your possession, references made that they would testify consistently to those reports. What was the basis of the motion in Lemonet? What specifically were you claiming? A technical violation of 213? Prejudice of some sort? And if so, what kind? Now, keeping in mind, Your Honor, the motion in Lemonet on the police and fire was brought by my co-defendant. But the point was, as you pointed out to the plaintiff's lawyer, you gave us a list of 191 people, and if you read the reports of these individuals, such as the police chief, they say nothing that's relevant with regard to what happened to Dr. Eizelt that wasn't already admitted. For example, the police chief in that case, Rick Nichols, said, I was in my office, there was a big explosion, the wall shook, I went over to see what happened, and again we asked him, did you have anything to do with Dr. Eizelt that evening? He said, no, I didn't. And this may be better left for Ameren, but did you join in that motion, and did you argue? I don't believe I argued, I tried the case for Ameren. Okay. Yeah. All right, I'll save it for other counsel. So, and for just another example of the judge's discretion in this case, plaintiff wanted to take the deposition of Ameren's CEO, Richard Mark. We objected to that. There were at least two hearings on that point, and the judge asked Mr. Jansen repeatedly, what is it that the CEO of this company is going to say that's relevant? And Mr. Jansen talked about, well, I want to talk about training, and I want to talk about these maps. And the judge said, well, there's no indication the CEO knows about those. But he then turns to me and says, Ameren, I want you to produce the most knowledgeable person on training. And that was Mr. Bozer, and he was opposed twice. I want you to produce the person most knowledgeable about these maps, and we did that. Then for two years, we don't hear a word from the plaintiff that they're somehow dissatisfied with the information they were able to get. Until we get to the eve of trial, and suddenly, now we see a notice of evidence deposition to bring in the CEO. So, again, Judge Ewing, using his judgment and his discretion to manage this case was entirely appropriate. The second point I wanted to make was to follow up, Judge, on your question. When you look at the post-trial motion, many of the issues that are now raised were not mentioned at all. For example, the last three issues as to Ameren that are various evidentiary rulings, they're nowhere to be found in the post-trial motion. And I appreciate waivers of limitation on parties, not the court. But in this case, much of what the plaintiff is now arguing was forfeited. The last point I want to make is with regard to what is claimed to be the inconsistency based on the lack of damages awarded to Dr. Eisele in this case, even though there was a finding against Shershot. The plaintiff in this case made a very conscious choice as to the theory of the case. They disclaimed in front of the jury, I don't want medical bills, I don't want property damage, told the jury that they had insurance that had paid for all of this. From the very beginning, they tried to set this up as a closed head injury or a brain injury case. There was never a specific reference in closing to disregarding the ankle and rib fractures, though, was there? Yeah, I don't recall the record that clearly as to Mr. Jansen's argument. Is your argument that the inference that the jury was to take from Mr. Jansen's argument was they were being invited to disregard the lesser claimed injuries of the ankle and rib fractures and focus strictly on the brain injuries that were being claimed? I think that's a fair inference, and that's certainly how I appreciate what his theory of the case was, is trying to ring the proverbial bell with a head injury as opposed to a case that otherwise was worth maybe $125,000 if you add everything else up. Had he asked for those elements of damages, property damage, medical bills, things of that nature. Was anything put up on a board showing requested damages for line item elements that had been established? I don't believe he used anything in closing for that purpose. Okay. Excuse me, counsel, if I could follow up on that question. And so the discussion as it related to emotional distress and loss of normal life experiences was as it correlated with the brain injury, not specific discussions as it related to the rib or ankle fracture? Yeah. I believe that's what he was seeking as he presented the case to the jury when he then stood up in closing and said, I want $40 to $50 million. So I think the jury took him at his word. If there are no further questions, I'm going to yield any remaining time to my co-defendant. I see no further questions. Thank you. Thank you, Mr. Wilson. Mr. Waco? May it please the court. I've been practicing the appellate course at Illinois since 1984. And the rules governing the appellate procedure have changed quite a bit during that period of time. But there's a couple of rules that haven't changed. And those are the rules related to prosecuting appeals where there was a jury trial involved in the trial court. In particular, there are two rules that are important for the resolution of this appeal. Illinois Code of Civil Procedure 2-1202 and Illinois Supreme Court Rule 366. 2-1202 says that before filing an appeal for a jury trial, you first have to file a post-trial motion, which raises with specificity the grounds you are seeking to have the court determine which were made, the errors the court made, and request with specificity the relief being requested. Supreme Court Rule 366 says that a party may not urge his error on appeal, any point, ground, or relief not specified in that party's post-trial motion. The plaintiff in this case has violated both the provisions of 2-1202 and 366 in quite a few areas. Mr. Wilson spoke to a couple of them. I'm going to confine my comments today just to the ones that relate to my client, Mid-Century Telephone. When we look at the post-trial motion, I believe Mr. Jansen stated during his argument that the issue of inconsistent verdicts, that the argument raised in the appellant's brief that the verdicts in favor of Mid-Century were conflicting with the verdicts against Shershot and Cahill, Mr. Jansen said that had been raised in the post-trial motion. It was not raised in the post-trial motion. And as a result of that, that issue has been waived for appeal. But that's not the only issue that was not raised in the post-trial motion. One of the arguments raised in the appellant's brief against my client was that the verdict of the jury was against the manifest weight of the evidence. That argument was not raised in the post-trial motion at all. So that is another issue that's been waived. Part of the relief that's being requested in the appellant's brief regarding Mid-Century, that the appellant is asking this court to enter a judgment against Mid-Century and to remand the case to the trial court solely on the issue of damages. That was not relief that was requested in the post-trial motion. And 366 says if you don't request relief in your post-trial motion, you can't request that relief from the appellant court. So that relief is not available to the plaintiff in this case. I believe Mr. Jansen mentioned that the de novo standard of review applied to everything in this case. It doesn't. There are a number of issues before the court where the abuse of discretion standard is the relevant standard. The trial court barred the testimony of certain witnesses on the grounds they were cumulative. The trial court judge did that under provisions of Illinois Rule of Evidence 403. The trial court's ruling in that regard is subject to an abuse of discretion standard on review. The trial court's ruling that the plaintiff had violated Supreme Court Rule 213-F1 in his answers, that's subject to an abuse of discretion review. The trial court's exclusion of certain expert testimony, that's also subject to an abuse of discretion review. So there are a number of issues where the abuse of discretion standard is going to apply here. I believe also that Mr. Jansen mentioned, I think he mentioned, that when the plaintiff submitted their 213-F1 answers that there were reports attached to the answers. There were not. There's a reference in the answer itself that says, well, here, let me read it. So the 213-F1 answers state, and I'm quoting here, plaintiff expects each witness to testify consistently within the context of each witness' disclosed role and or reports previously provided. The reference reports previously provided isn't identified. It doesn't talk about police report or fire department report. And these reports that are being referenced aren't just for the three witnesses that wound up being barred from testimony by the trial court. Those reports referenced in that answer relate to all 191 lay witnesses. So I'm assuming, I don't know because the reports aren't identified, but they're talking, the plaintiff was talking there more than just about the police report. They're talking about the reports that covers all 191 witnesses apparently. How far in advance of trial were those 213s provided, the answers? I can't answer that. Perhaps Mr. Wilson could. I didn't participate in the trial, so. Okay. When Ameren got those answers, do you know what they did with them? I mean, was there ever a court filing for requesting a motion to compel more specific answers, anything along those lines? I don't believe so. I didn't see one in the record. I don't know that a personal file, because that record was huge. I suppose Ameren would have had the option to just sit by until trial and move in Lemonay to exclude based on an inadequate disclosure, which is what it did. Is that right? Well, it wasn't Ameren. It was. I'm sorry. It was me. The mid-century. Yeah, mid-century. And that is what happened, correct? Yes, Ameren had filed a motion first to exclude those witnesses, but that motion wasn't based on 213, I don't believe. That was based on the cumulative evidence issue, and that the testimony of those witnesses would have been cumulative to other evidence. We then filed a motion, we being mid-century, that also raised the cumulative evidence issue, but in addition it added the 213 death warrant failure as well. But those were motions in Lemonay, so they were done fairly closely to the date of the trial. Even the issues we're talking about now, whether the trial court erred in determining that the testimony of those three witnesses was cumulative, that issue has also been waived. The post-trial motion objects to the trial court's exclusion of the testimony of the three witnesses we're talking about from the canton fire and police departments, but it doesn't argue that the trial court made a mistake in finding that evidence to be cumulative, and it doesn't argue that the evidence was non-cumulative. If you read the post-trial motion, you can't even tell the judge ruled that it was cumulative. There's no reference in the rules in the motion to that. There's no reference to Illinois Rule of Evidence 403, which is what the trial court relied on. In addition, that post-trial motion makes no reference to the trial court's ruling under 213 F1. So although the plaintiff did object in his post-trial motion to the fact that the trial court had excluded the testimony of the three police and fire department witnesses, he never argued that he had complied with 213 F1, and he never argued that the trial court had made a mistake in finding that he did. True 12.02 requires the raising of issues with specificity. Those issues were not raised at all, let alone the specificity, and as a result, they're waived. In my humble opinion, they're waived. Even in the appellant's brief, the appellant never argued that he complied with 213 F1. He said it didn't matter whether he complied with that rule because everybody already knew what the testimony of these three witnesses would be because of this police report that had been floating around. First of all, the reports mentioned in the 213 F1 answers weren't just related to the police and fire people, as I mentioned. They were related to all 191 witnesses. The purpose of those disclosures under 213 F1 is to give the opposing party an opportunity to figure out which of the lay witnesses would be worth deposing and which would not be worth deposing. Well, when you get the name of 191 lay witnesses and you don't get the subject of the testimony of any of them, it's impossible to figure out who you'd want to depose and who you would not. The compliance with the provisions of 213 F1 is a mandatory requirement, and the plaintiff flat out did not comply with those requirements. Rule 213G states that the information disclosed in the answer to a 213 F1 interrogatory limits the testimony of a witness in direct examination at trial. Since the plaintiff's 213 F1 answers didn't disclose the subject of the testimony of anybody, let alone Plumber, Nichols, and Arnold, the trial court did not err by barring the testimony of those witnesses. Are you summing up, counsel? You're out of time. Thank you. Thank you. Roberto? You know, if we look at this as an overview, what really happened here? These airline workers weren't properly trained. They didn't know the rules, the federal rules. They believed that the gas is escaping into the air, but they ignored totally federal regulation, federal rules, state rules, and their own rules that when you have an underground leak, it's ultra-hazardous, it's dangerous, and you have to do certain things. You have to evacuate. You start there. And they made a mistake, but they were victims just like Tom Izzo was a victim. They just didn't have proper training. And that's why I wanted the president of the company to come and say, why don't you follow the rules? If he's going to say it's discretionary like all the witnesses said, oh, it's discretionary. There's no discretion in these rules. You don't find any discretion. Now, let me talk a minute about this 213 business. Look at the last page in the brief of mid-century. The last page is discovery that was produced, the last page, A23, by the city of Canton in 2016. We didn't try this case until 22. City of Canton detective Arnold interviewed Jim Browmer, Jr., chief executive officer for Adams and Mid-Century Communication, on November 17, 2016, about the project performed by Mid-Century. Detective Arnold spoke with Brett Cahill on November 17, 16. Detective Arnold's reports are contained within the police report. Now, that's in their own brief. That's in the brief of Mid-Century. And say they didn't know about these things. And then counsel said, well, I did get some reports, but I didn't read them. You know, the jury didn't hear the liability evidence. They didn't hear that the excavator was moved up within feet of the emitting gas. They didn't hear. I couldn't even mention that the man was down in the hole and was killed. It was a one-sided trial. I tried the case for this court because I knew I wasn't going to win it because all the liability was eliminated. Remember this. This case isn't over. A broken ankle, a broken rib. This man went into the hospital with an elevated white count of 25,000. His body broke out into boils, lesions. He went to a dermatologist. Dermatologist said, you go to a cancer doctor. He has leukemia. Not recession. He has leukemia, active leukemia. He takes medicine 17,500 a month because the stress from this activated leukemia. And we put all that evidence in, and it's all, again, offer of proof. The jury didn't hear any of that. And why I said we didn't want to get damages for his time off. I wasn't trying this case for his insurance company. I didn't want segregation on the case. I wanted a clean case. He didn't want double recovery. He's a good man. He wanted his story told. I did the best I could under really tough circumstances. Thank you. Thank you, counsel. We'll take this matter under advisement and now stand adjourned.